UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN MASCK,

    Plaintiff,

-vs-

THE HERALD COMPANY, INC.,
a foreign corporation,

    Defendant-Appellant.
                                  /

Case No. 07-10511
Judge Avern Cohn

# MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This is an employment discrimination case. Plaintiff Brian Masck ("Masck") worked as Technology Editor and Director of Photography for The Flint Journal from February 1999 until he was terminated in November 2006. Masck is suing Defendant The Herald Company, which owns and operates The Flint Journal as well as other newspapers, claiming that his termination was motivated by age discrimination and that he was discharged without just cause in breach of his employment contract. Before the Court is Defendant's motion for summary judgment. For the reasons discussed below, Defendant's motion is GRANTED.

# I. Facts

The following are the facts as gleaned from the record. None are in serious dispute.

## A. Facts Related to Masck's Job Performance

Masck was born September 13, 1962. He graduated with a bachelor's degree from the University of Michigan in 1985, and first went to work for Defendant as a staff photographer for the Muskegon Chronicle in April 1986. Masck continued in that position until 1994, when he became Technology Coordinator for the Chronicle. In 1999, Masck went to work for The Flint Journal, first as Technology Editor and later as Director of Photography. In both positions, Masck reported to the Journal's Editor. From the time Masck began his employment with the Journal until April 2006, the Editor was Paul Keep ("Keep"); in April 2006, Tony Dearing ("Dearing") became the Editor.

Keep says that, over the course of Masck's employment with the Flint Journal, he had "at least a half dozen to a dozen" conversations with Masck concerning problems with Masck's job performance. These conversations "tended to deal with communication and working with fellow employees." In particular, Keep says that other employees reacted badly to emails from Masck that they perceived as angry or offensive, and Keep therefore encouraged Masck to deal with other employees face to face. Other employees, including Managing Editor Brooke Rausch ("Rausch"), complained that they often found it difficult to contact Masck and that he would fail to return phone calls; Keep therefore encouraged Masck to make himself more accessible.

On November 3, 2005, without consulting any other employee at the Journal, Masck sent out an email survey to the Journal's entire editorial staff regarding the

transition to a new editorial pagination software program. Although Keep did not object to the idea of the survey, he was upset that Masck failed to coordinate with other employees working on the transition process before distributing it. Keep discussed the incident with Adrienne Wells ("Wells"), the Journal's Director of Employee Relations, who recorded her recollections of the conversation in a memorandum dated November 4, 2005. In the memorandum, Wells stated that "[a]ccording to Paul [Keep]...although Brian [Masck] is talented and educated, Brian positions himself so that he is never wrong and has no people skills; Brian could possibly be paranoid. Brian creates a 'hostile work environment' and 'makes people angry.'" At the close of the memorandum, Wells wrote that "Paul concluded: Brian hurts the newsroom and draws everyone down." In his deposition, Keep explained that the survey incident "came at a time when morale related to Brain was very low. And it became an issue for me trying to run the whole newsroom, to have that much of my time and the time of those who came to complain or state their concerns. It was not a smooth running operation. We had a major problem."

Dearing says that he experienced similar problems with Masck after taking over as the Journal's Editor in May 2006. On the morning of May 30, Masck emailed Dearing to notify him that he would be taking the week off. Dearing was not made aware of Masck's plans in advance of receiving the email. Dearing was upset that Masck had not requested the time off and did not give him any advance notice. However, after speaking to Dearing, Masck agreed to come in to work on at least one day later that week, and he did so.

Dearing also says that around September 2006, he had to suspend temporarily a weekly meeting concerning the Journal's internet operations that most of the managers attended after Masck engaged in an "angry outburst." Dearing counseled Masck on avoiding this sort of behavior, and the meetings resumed a short time later.

On October 18, 2006, Mary-Ann Chick-Whiteside ("Whiteside"), the Journal's Interactive Media Manager, met with Dearing to discuss her ongoing conflicts with Masck. Dearing wrote a memorandum concerning his meeting with Whiteside. In the memorandum, Dearing stated that Whiteside told him that Masck was a "constant impediment" to implementing the Journal's internet strategy who "continually misses deadlines, and makes projects late." Whiteside said that because Masck worked irregular hours he was often difficult to find and that Masck seemed upset when Whiteside talked directly with his staff. Whiteside also said that Masck had "no sense of teamwork" and refused to share critical pieces of equipment.

The same day, Journal photographer Steve Jessmore ("Jessmore") met with Dearing to complain about the manner in which Masck was handling the Journal's photography at Detroit Tigers playoff baseball games. Jessmore was frustrated that Masck insisted that photographers focus on game action at the expense of other photographs when the Journal photographers did not have field passes and did not have good angles to shoot the action. Jessmore thought that the Journal should rely on AP photographers for game action shots and use its own photographers for crowd shots and shots taken outside the stadium. Dearing spoke with Masck about Jessmore's concerns. After agreeing to focus on photographs of things other than game action, Masck proved difficult to reach and failed to respond to messages when Dearing and

the photojournalism staff attempted to formulate a more detailed plan.  Dearing's memo stated that "[w]hen all was said and done, I had devoted the better part of two days to sort out an issue that Brian had created through his own stubbornness and failure to listen to the input of his staff, when the solution turned out to be fairly obvious."

Dearing met another staff photographer, Jane Hale ("Hale"), about Masck on October 20, 2006.  Dearing again wrote a memorandum concerning this meeting.  Hale said that the photography staff was "frustrated and demoralized" by Masck's treatment.  She cited Masck's frequent failure to keep appointments, his irregular hours and inaccessibility, and his disorganization.  "She said that she believes the work environment is untenable and fears that our best photographers are looking to flee."

On November 1, 2006, Dearing met with Masck and gave him a written warning detailing various job performance problems.  In the warning, Dearing reprimanded Masck for "not returning calls to your supervisor and not being accessible to employees; sending 'angry' e-mails; making decisions and giving directions without consulting your supervisors...not being respectful and civil to those in the office; and not working well with others."  Dearing also stated that two employees had come to him during the previous month to complain that Masck frequently missed deadlines and failed to attend scheduled meetings and appointments, in addition to the problems listed above.  Dearing ordered Masck to communicate "in person, face-to-face, whenever possible."  Finally, the warning stated that if Masck's performance failed to improve, he could be subjected to disciplinary measures or lose his job.

The following day, November 2, Masck emailed Jessmore to schedule a meeting.  When Jessmore asked what the meeting concerned, Masck replied that "Tony [Dearing]

has started the firing process...He said that I'm not responsive enough to you and that the entire department, including you, have come to him complaining about me." Jessmore told Masck that he had not complained to Dearing. In response, Masck cancelled the prospective meeting and instructed Jessmore to "[g]o and tell Tony you don't think I should be fired." Later, Masck emailed Jessmore to say "I can't ask you to talk to [Dearing], but would sure appreciate it if you would."

Masck sent a number of other emails early on the morning of November 2. He emailed Steve Kleeman ("Kleeman"), a photographer, to inquire about press credentials issued for certain sporting events. Twenty minutes later, Masck emailed Dearing to say that he had asked Kleeman to resolve the issue earlier in the week, but Kleeman had failed to do so. Masck emailed his entire staff to say "I'm accessible to you 24-7, 365 via phone and e-mail." He sent a number of emails to Wells, and emailed Vertie Brewer, the Journal's Personnel Director, to request the job description for his position. He also sent another email to Dearing to complain about the performance of a member of his staff, Lisa DeJong.

Dearing learned about the emails and called Masck at home, asking him not to come into work. Later that day, however, Masck showed up at the Journal's office. Dearing instructed Masck to leave, and Masck complied.

Dearing terminated Masck on November 4, 2006.

### B. Other Facts Related to Masck's Termination

The parties agree that the portion of Masck's employment contract relevant to this case is the "job security pledge" contained in the Flint Journal Handbook. The pledge reads:

> We provide job security to all full-time, salaried employees who are not covered by a collective bargaining agreement. This means that no full-time, salaried employee will lose his or her job because of new equipment, technological advances or lack of work. Once you have satisfactorily completed a probationary period, you will become a permanent employee. Then, this unique job security pledge applies to you as long as you continue to perform your assigned tasks satisfactorily, do not engage in misconduct and this newspaper continues to publish.

Defendant uses this job security pledge not only for Flint Journal employees, but also for employees of its other publications.

Masck says that he understood the job security pledge to create a good cause employment relationship and to guarantee that he would be afforded progressive discipline procedures before he was terminated. Gwen Kassa, the former Human Resources Manager for the Ann Arbor News, testified that based on statements made by various managers within the company, she also understood the job security pledge to create a good cause employment relationship.[1] Several managers at The Herald Company testified that they typically attempt to resolve job performance problems through counseling or other measures before terminating a problematic employee, but that The Herald Company did not have any formal policy or procedure in this area.

---

[1] The Herald Company argues that Kassa's affidavit is inadmissible because she was not listed in Masck's witness list or in response to interrogatories and because the affidavit contains inadmissible legal conclusions and hearsay. Because Kassa's testimony does not bear upon the outcome of the case, it is not necessary to resolve this issue.

In 2006, The Herald Company made buyout offers to some of its older employees. Around the time that offers were made, Masck discussed the issue with Rausch. According to Masck, during the course of this conversation, Rausch said "something to the effect of, 'too bad you're not old enough to, you know, be able to take the buyout.'" Masck testified that other than Rausch's comment, no one said anything to him that led him to believe that age was a factor in his termination.

Masck says that younger employees were dealt with "using a progressive discipline model," whereas he "was fired very quickly and treated very poorly on discharge." Specifically, Masck points to a staff member in the sports department whose name he does not know. Masck says that this employee had problems with regular work attendance and substance abuse, was given to multiple chances to correct his behavior, and was ultimately terminated.

### III. Legal Standard

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of

the nonmoving party is not sufficient to show a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50. Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings. Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52). The Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255. Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted. Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

## IV. Analysis

### A. Masck's Claim for Breach of a Good Cause Job Security Contract Fails Because the Unambiguous Language of The Herald Company's "Job Security Pledge" Created a Satisfaction Contract

The employment agreement between the parties created a "satisfaction" contract, and The Herald Company was therefore not obliged to offer a "good cause" justification for terminating Masck. "[A]s a general rule, contracts of employment for an indefinite term are terminable at will by either party...However, the presumption of at-will employment may be overcome...by a provision forbidding discharge without just cause." Bracco v. Mich. Tech. Univ., 231 Mich. App. 578, 598 (1998). "The courts should not lightly infer a finding of a policy of discharge only for cause." Id. at 599.

The contract at issue here did not forbid discharge without just cause. The contract provided that Masck would keep his job "as long as [he] continue[d] to perform [his] assigned tasks satisfactorily, [did] not engage in misconduct and this newspaper continues to publish." Two courts have addressed the exact language at issue here in the course of resolving a dispute between The Herald Company and a terminated employee, and both held that it created a satisfaction contract. Shriner v. The Flint Journal, No. 230346, 2003 WL 1447873 (Mich. App. March 13, 2003); Woods v. The Herald Company, No. 2:98-CV-73766-DT (E.D. Mich. May 21, 1999). Many cases interpreting quite similar language reach the same result. See, e.g., Bracco, 231 Mich. App. at 602-03 (statement that "You can stay till sixty-five, if you perform satisfactorily" created a satisfaction contract).

Given that the employment agreement created a satisfaction contract, Masck's claim that The Herald Company breached the agreement fails. "An employer may discharge under a satisfaction contract as long as the employer in good faith is dissatisfied with the employee's performance or behavior. The employer is the sole judge of whether the person's job performance is satisfactory." Meagher v. Wayne State Univ., 222 Mich. App. 700, 722-23. "An employee hired under such a contract may be discharged at any time and for no reason; the employer can do so arbitrarily and capriciously." Bracco, 231 Mich. App. at 598. The record discloses ample reasons why The Herald Company may in good faith have been dissatisfied with Masck's performance.

Masck points to his own belief and the belief of another former employee of The Herald Company, Gwen Kassa, that the contract created a good cause employment relationship. "It is beyond doubt that the actual mental processes of the contracting parties are wholly irrelevant to the construction of contractual terms. Rather, the law presumes that the parties understand the import of a written contract and had the intention manifested by its terms." Burkhardt v. Bailey, 260 Mich. App. 636, 656 (2004). The language at issue here unambiguously created a satisfaction contract.

**B. Masck's Claim of Age Discrimination under MCL § 37.2202(1)(a) Fails Because He Has Not Proffered Any Direct or Indirect Evidence of Discrimination**

Masck next argues that he was terminated at least in part because of his age, which would violate MCL § 37.2202(1)(a). A plaintiff may prove age discrimination through direct or indirect evidence. Town v. Mich. Bell. Tel. Co., 455 Mich. 688, 694-95 (1997). Alternatively, a plaintiff may use the burden-shifting analysis first developed for

11

discrimination claims under federal law.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under the burden-shifting analysis, a plaintiff can make out a *prima facie* claim of discrimination by proving that (1) he is a member of a protected class, (2) that he suffered an adverse employment action, (3) that he was qualified for his position, and (4) other similarly situated persons outside the protected class were unaffected by the employer's conduct.  Town, 455 Mich. at 695.  Once a plaintiff proves his *prima facie* case, discrimination is presumed and the burden shifts to the employer to come forward with a nondiscriminatory reason for the adverse employment action.  If the employer does so, the presumption of discrimination disappears and the burden shifts back to the employee to prove that discrimination was the employer's true motive in taking the adverse action.  Id.

Assuming *arguendo* that Masck could make out a *prima facie* case of age discrimination, his claim still fails because The Herald Company has put forward a legitimate, nondiscriminatory reason for Masck's termination and Masck has no evidence to rebut it.  The Herald Company says that it discharged Masck for poor job performance.  There is a great deal of evidence to support this: numerous employees complained about Masck's performance to his supervisors and testified that Masck was difficult to work with, inaccessible, and frequently missed appointments and deadlines.

The only evidence Masck proffers to suggest that discrimination was the true reason for his termination is a previously described stray comment made by Rausch, the Journal's managing editor, in May 2006.  Rausch's comment, "something to the effect of, 'too bad you're not old enough to, you know, be able to take the buyout," does not obviously suggest any sort of discriminatory animus.  Rausch made the statement in

the course of a casual conversation that was entirely unrelated to Masck's termination. Moreover, Rausch was not Masck's boss and did not decide whether or not to terminate him. "Stray workplace remarks [and] statements by non-decision makers...do not constitute direct evidence that unlawful discrimination was a determining factor in the employer's decision." Hatmaker v. Xerox, 1998 WL 1991212 at *3 (Mich. App. June 30, 1998) (per curiam) (affirming grant of summary judgment for defendant in race discrimination case where plaintiff's supervisor said "they just could not put a white male in that position," but supervisor was not actually involved in the promotion decision); see also Micale v. Little Caesar Enter., Inc, 2001 Mich. App. LEXIS 935 at *7 (June 1, 2001) (affirming grant of summary judgment for defendant in age discrimination case where human resources manager made isolated comment suggesting that plaintiff was let go because of his age but did not actually participate in the termination decision). Rausch's comment is not probative of discriminatory motivation on the part of The Herald Company, and Masck proffers no other evidence tending to suggest discrimination.

## V. Conclusion

For the reasons stated above, The Herald Company's motion for summary judgment is GRANTED. The case is DISMISSED.

SO ORDERED.


Dated: December 14, 2007      s/Avern Cohn
                              AVERN COHN
                              UNITED STATES DISTRICT JUDGE

07-10511 Masck v. The Herald Company, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, December 14, 2007, by electronic and/or ordinary mail.

 s/Julie Owens
Case Manager, (313) 234-5160